# EXHIBIT F

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

*Ex parte* BRAD KRASSNER, NIKOLAI MENTCHOUKOV,
FRED BERNSTEIN, and ALAN EDWARDS[1]

———————

Appeal 2017-010139[2]
Application 11/803,779[3]
Technology Center 3600

———————

Before ALLEN R MACDONALD, JAMES B. ARPIN, and
NABEEL U. KHAN, *Administrative Patent Judges.*

ARPIN, *Administrative Patent Judge.*

## I.    DECISION ON APPEAL

Appellants appeal under 35 U.S.C. § 134(a), the Examiner's decision rejecting claims 1, 2, 4, 5, 7, 9–13, 15–18, 20, 21, 23–25, 31, 33, and 35–37. Final Act. 2, 3; App. Br. 1.  Claims 3, 6, 8, 14, 19, 22, 26–30, 32, and 34 are

———————

[1] According to Appellants, Rich Media Club, LLC is the real party-in-interest.  App. Br. 2.

[2] In this Decision, we refer to Appellants' Appeal Brief ("App. Br.," filed October 5, 2016) and Reply Brief ("Reply Br.," filed July 24, 2017); the Final Office Action ("Final Act.," mailed April 5, 2016); the Examiner's Answer ("Ans.," mailed May 22, 2017); and the originally filed Specification ("Spec.," filed May 16, 2007).

[3] This application is a continuation-in-part of U.S. Patent Application No. 11/643,245, which is the subject of Appeal No. 2017-009980.  Spec. 1.

Appeal 2017-010139
Application 11/803,779

cancelled.  App. Br. 26–31 (Claims App'x).  We have jurisdiction under 35 U.S.C. § 6(b).

We reverse.

## II.    STATEMENT OF THE CASE

The recited systems and methods relate to:

creating electronic advertisements using licensed digital content, and distributing such advertisements for display at desired network locations, including on multiple networks (such as, without limitation, computer networks such as the Internet as well as cellular, wireless, cable, satellite and other networks), whereby the ad to be displayed at a particular network location is selected from a group of ads that reference the same keyword or category and network location via an auction when the display location is acted upon by a network user/ad viewer.  The digital content is delivered to designated advertising locations on the network and becomes part of an advertising display composed at the time requested by the network user/ad viewer by using a relational database for storing data required for commands that execute retrieval, assembly and dispatching of the licensed digital content files previously stored in one or more servers, as well as messaging, tracking, display, and billing for both use of the licensed content and display of the ad at the designated location on a cost-per-use basis.  Third parties that make their digital content available for licensing and the publishers that display the advertisements on their network locations are automatically paid via the system each time an ad is displayed using their content and ad space, respectively.  Ad publishers can participate in a barter-based ad exchange network wherein ad publishers can exchange advertising impressions/views in their publication (whether online or other) for impressions/views of their advertisements via the network.

Spec. ¶ 10.

As noted above, claims 1, 2, 4, 5, 7, 9–13, 15–18, 20, 21, 23–25, 31, 33, and 35–37 are pending.  Claims 1 and 18 are independent.  App. Br. 25–

2

Appeal 2017-010139
Application 11/803,779

26, 39 (Claims App'x). Claims 2, 4, 5, 7, 9–13, 15–17, 25, 31, and 35–37 depend directly or indirectly from claim 1; and claims 20, 21, 23, 24, and 33 depend directly or indirectly from claim 18. *Id.* at 26–28, 30–32.

Claim 1, reproduced below, is illustrative.

1. A system comprising:

a electronic database configured to store a plurality of records comprising:

one or more commands for retrieving one or more of a plurality of electronic content files designated by one or more advertiser users;
*one or more commands for assembling and presenting the one or more designated electronic content files as an electronic advertisement at one or more of a plurality of webpages*; and
one or more parameters for presentation of the electronic advertisement at the one or more webpages; and

one or more computing systems operable to:

generate, in response to one or more options selected by a particular one of the one or more advertiser users in a user interface, first code for placement at a particular one of the webpages, the first code written to cause a billboard module to be loaded when the particular webpage is loaded, the billboard module comprising second code written to:

communicate, over one or more computer networks, with the one or more computing systems; and

retrieve and display one or more advertisements on the particular web page;

select, in response to a communication from the billboard module over the one or more computer networks, a subset of the plurality of records stored in the database, the selection based at least in part on one or more keywords in the communication from the billboard module;

3

Appeal 2017-010139
Application 11/803,779

> after selecting the subset of the plurality of records based at least in part on the one or more keywords in the communication from the billboard module, *conduct an auction to select a winning advertisement from the selected subset of records*;
>
> *provide instructions to the billboard module for the billboard module to retrieve the winning advertisement and present the winning advertisement in an area on the particular webpage designated by the billboard module*; and
>
> *provide an interface for a webpage provider to contribute one or more advertising views/impressions on one or more webpages of the webpage provider in barter exchange for one or more advertising views/impressions on one or more webpages of another webpage provider.*

*Id.* at 25–26 (disputed limitations emphasized); *see id.* at 28 (claim 16 (reciting "barter transactions"); claim 17 (reciting "a pool of available advertising impressions/views.")), 31 (claim 25 (reciting "the right to display" given "in exchange for the contributed advertising views/impressions."")); *see also* Spec. ¶ 110 ("[A]d publishers can participate in a barter-based advertising exchange network wherein ad publishers can exchange advertising impressions/views in their publication (whether online or other) for impressions/views of their own advertisements at third party publisher network locations."), Figs. 44–50 (depicting "Ad Swap Program" embodiment).

4

Appeal 2017-010139
Application 11/803,779

## III.    REFERENCES

The Examiner relies upon the following prior art in rejecting the pending claims:

| | | |
|---|---|---|
| Patel *et al.* ("Patel") | US 7,962,363 B2 | Issued June 14, 2011; Published May 27, 2004 |
| Scholl *et al.* ("Scholl") | US 8,447,651 B1 | Issued May 21, 2013; Filed Jan. 25, 2005 |

## IV.    THE REJECTIONS

Claims 1, 2, 4, 5, 7, 9–13, 15–18, 20, 21, 23–25, 31, 33, and 35–37 are rejected under 35 U.S.C. § 101 because the claimed invention is directed to a judicial exception (i.e., a law of nature, a natural phenomenon, or an abstract idea) without significantly more. Final Act. 2–3. Claims 1, 2, 4, 5, 7, 9–13, 15–18, 20, 21, 23–25, 31, 33, and 35–37 also stand rejected under 35 U.S.C. § 103(a) as rendered obvious over the combined teachings of Patel and Scholl. *Id.* at 3–10.

Unless otherwise indicated, we adopt the Examiner's findings in the Answer as our own and add any additional findings of fact appearing below for emphasis. We address these rejections below.

*A. Patent Eligible Subject Matter*

Under 35 U.S.C. § 101, a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." The U.S. Supreme Court has "'long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable.'" *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).

5

Appeal 2017-010139
Application 11/803,779

The Court in *Alice* reiterated the two-step framework previously set forth in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66, 75–79 (2012), "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. The first step in that analysis is to "determine whether the claims at issue are directed to one of those patent-ineligible concepts," such as an abstract idea. *Id.*

The Court acknowledged in *Mayo* "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 566 U.S. Ct. at 71. We, therefore, look to whether the claims focus on a specific method or means that improves the relevant technology or are directed instead to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016). If the claims are not directed to an abstract idea, the inquiry ends. *Id.* at 1339. Otherwise, the inquiry proceeds to the second step where the elements of the claims are considered "individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 566 U.S. at 78, 79). That is whether the claims recite elements making the claims *significantly more* than the judicially excepted subject matter.

With regard to the first step of the *Alice* analysis, the Examiner determines that "[c]laim(s) 1-2, 4-5, 7, 9-13, 15-18, 20-21, 23-25,31, 33 and 35-37 is/are directed to the abstract idea of: providing an online advertising auction platform" and, in particular, to "**providing an online advertising**

Appeal 2017-010139
Application 11/803,779

**platform and conducting an auction**." Final Act. 2, 11–12. With regard to the second step of the *Alice* analysis, the Examiner further finds that "[t]he claim(s) does/do not include additional elements that are sufficient to amount *to significantly more* than the judicial exception because the additional elements of 'retrieving..., assembling... and presenting...' are merely instructions to implement the idea on a general computer." *Id.* at 2 (emphasis added). Referring to claim 1, the Examiner finds that each of the additional limitations to the identified abstract idea, namely, including one or more commands in the database, generating a first code to be uploaded with a particular webpage, communicating between computer systems, retrieving and displaying an advertisement on a webpage, selecting a records subset based on keywords, providing instructions to retrieve and present the auction winning advertisement, and providing an interface for a webpage provider to contribute one or more advertising views/impressions in barter exchange for one or more advertising views/impressions of another webpage provider, are themselves no more than abstract ideas. *Id.* at 12–14 (citing *SmartGene, Inc. v. Advanced Biological Labs., SA*, 555 F. App'x 950 (Fed. Cir. 2014); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014); and *Cyberfone Sys., LLC v. CNN Interactive Grp, Inc.*, 558 F. App'x 988 (Fed. Cir. 2014)); *see also* Ans. 4–7 (adding citations to *Classen Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057 (Fed. Cir. 2011) and *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016)). The Examiner determines that:

> Generic computers performing generic computer functions, alone, do not amount to significantly more than the abstract idea. *Considered individually*, the steps of **receiving and retrieving electronic content, assembling and presenting electronic**

7

Appeal 2017-010139
Application 11/803,779

> **content, generating information providing an interface and conducting an auction**[ f]urther describe the abstract idea but do not make it less abstract. . . . *Considered as a whole*, the recited steps merely organize the abstract idea into a stepwise description of a process used to perform the abstract idea and amount to no more **conducting an online auction, receiving electronic content and applying parameters to assemble and display electronic content**. The claim merely instructs the practitioner to implement the concept of **providing an interface, conducting an online auction, receiving electronic content and applying parameters to assemble and display electronic content** with routine, conventional activity specified at a high level of generality in a particular technological environment. When view[ed] either individual[ly] or as an order[ed] combination, the claim as a whole does not add significantly more to the abstract idea of **providing an online advertising auction platform**. As such, the claim is not patent eligible.

Ans. 7–8 (italics added).

Appellants contend, however, that the recited systems and methods are "necessarily rooted in computer technology because they address a problem that only arises in the realm of computer networks," and, therefore, are analogous to those found patent eligible in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). App. Br. 10–13; Reply Br. 2–4. Specifically, Appellants contend that certain features of the claims "address the problem of minimizing the network and computational resources needed to facilitate presenting advertisements on webpages. This problem has no pre-computer analog . . . ." App. Br. 11.

In *DDR Holdings*, the Federal Circuit noted that "[a]lthough the claims address a business challenge (retaining website visitors), it is a challenge particular to the Internet." *DDR Holdings*, 773 F.3d at 1257. Like other cases in which the Federal Circuit found the claims patent ineligible,

Appeal 2017-010139
Application 11/803,779

the claims in *DDR Holdings* "involve both a computer and the Internet." *Id.*

However, the Federal Circuit found that that the claims in *DDR Holdings:*

> stand apart because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.

*Id.* Here, the claims similarly recite a business challenge, i.e., placing the appropriate advertisement on webpages retrieved as the result of a search, but make clear that this problem is technological in nature, involving both computers and the Internet. App. Br. 10; *see* Spec. ¶¶ 7, 19.

As the Specification explains:

> The present invention improves over prior advertising systems and methods in many ways. The present invention does not embed advertising HTML files within a web page, providing considerable economies to advertisers in saved labor, time and cost in terms of both inserting advertisements into web page files, and later changing any of those advertisements. The present invention functions totally transparently to a network user and which neither inconveniences nor burdens the user. The present invention does not require a network user to download or install on the user's computer a separate application program specifically to receive advertising or perform any affirmative act other than normal browsing to receive such advertising. The present invention also provides proper accounting to an advertiser, content licensor and ad publisher by accurately and validly ascertaining and tracking user click-throughs/impressions of fully rendered advertisements. The present invention also allows ad publishers to maximize the revenues an increase effectiveness they receive from running third party ads, by being able to select for display (via the auction) the most profitable ads due to cost-per-click and click-through rate statistics. The present invention allows advertisers to more accurately target their advertising on search engine

9

Appeal 2017-010139
Application 11/803,779

> websites by separating the advertising auction process from the search engine process, allowing for second generation relevancy. The present invention allows for optimization of advertising campaigns by allowing for real-time auctions for available advertising spots, taking into account the amount of available advertising spots at the time of the action, optimizing the value of the advertising spot at the time it is requested, and by allowing for the assembly of advertising *on the fly* for display on the network, and the ability to license quality digital media creative files on a cost effective cost-per-use basis, and update campaign parameter and creative according to campaign results derived *in real[-]time* by FSDC tracking.

Spec. ¶ 19 (emphases added); *see id.* ¶¶ 7 (discussing improvements over past practices), 8 (defining "FSDC"). Appellants contend that the recited system operations and method steps address the described problems and achieve the sought improvements. App. Br. 10–11. The Examiner asserts, however, that the claims do not recite *how* recited systems and methods achieve the improvements identified in the Specification. Ans. 2–3. We disagree.

We are persuaded by Appellants' contentions that the claims are rooted in computer technology. For example, each independent claim addresses the problem of inserting appropriate advertisements *into webpages* based on stored parameters (App. Br. 25–26, 29 (Claims App'x (claims 1 and 18)); *see id.* at 26, 27, 30 (Claims App'x (claims 5, 9, 23, and 24))) and recites "generat[ing], in response to one or more options selected by a particular . . . advertiser user[] in a user interface, *first code* for placement ata particular one of the webpages, *the first code written to cause a billboard module to be loaded when the particular webpage is loaded*" (*e.g., id.* at 25 (Claims App'x (claim 1 (emphases added)))). Further, each of the independent claims recites that "*the billboard module* compris[es] *second*

10

Appeal 2017-010139
Application 11/803,779

*code* written to: communicate, over one or more computer networks, with the one or more computing systems; and retrieve and display one or more advertisements on the particular web page." *E.g.*, *id.* at 25 (Claims App'x (claim 1 (emphases added))). Thus, the limitations reciting generation of "first code" and "a billboard module" comprising "second code" indicate that the recited systems and methods seek to solve problems rooted in computer technology and arising in the context of advertising on webpages, rather than advertising in media in general, and how the recited systems and methods solve these problems.

In addition, dependent claim 2 recites that "the billboard module is operable to transmit to the one or more computing systems *a tracking string* as a message with *tracking data* regarding presentation of the displayed advertisement." App. Br. 26 (Claim App'x (claim 2 (emphases added))); *see id.* at 27 (Claims App'x (claim 10 (reciting "a tracking server"))). As the Specification explains:

> The present invention allows advertisers to create their own advertisements and license quality third party digital content for use in creating their advertisements (and also for content creators and providers to market their content) with payment for licensing of such third party content and ad distribution based on a cost-per-click, cost-per-impression or other pay-as-used scheme and with clicks/usage of the licensed ad content being accurately trackable.

Spec. ¶ 12; *see id.* ¶¶ 17 ("The system serves the advertisement files in addition to tracking impressions and click through rates in real time while the advertisement runs."), 18 (linking the use of FSDC technology "to process ad viewer activity tracking data"). The monitoring of such tracking data, such as impressions and click through rates, relates to data generated by viewing of advertisements *on a webpage*, which also seeks to solve

11

Appeal 2017-010139
Application 11/803,779

problems rooted in computer technology and arising in the context of
advertising on webpages, rather than advertising in media in general.

Accordingly, as in *DDR Holdings*, the claims recite "a solution to this
network-centric challenge," e.g., the efficient, timely, and cost effective
application of advertisements to webpages, for which there was no pre-
computer or pre-Internet analog.  App. Br. 10–11.  The Examiner provides
no evidence or persuasive argument to the contrary.  Thus, the claims here
recite "significantly more" than the abstract idea of "providing an online
advertising platform and conducting an auction."

The Examiner erred in finding the recited systems and methods patent
ineligible, and we do not sustain the Examiner's rejections under 35 U.S.C.
§ 101.

### B. *Nonobviousness Over Patel and Scholl*

The Examiner finds that claims 1, 2, 4, 5, 7, 9–13, 15–18, 20, 21, 23–
25, 31, 33, and 35–37 are rendered obvious over the combined teachings of
Patel and Scholl.  Final Act. 3–10.  In particular, referring to claim 1, the
Examiner finds that Patel teaches or suggests a system including one or
more servers that store and dispatch one or more webpages on one or more
computers.  *Id.* at 3 (citing Patel, 10:4–11).  Further, the Examiner finds that
Patel teaches or suggests a database storing a plurality records, those records
including commands for retrieving and receiving one or more plurality of
electronic content files designated by one or more advertiser users,
commands for assembling and presenting the one or more designated
electronic content files (e.g., customized content) as an advertisement at one
or more plurality of webpages, and parameters (e.g., advertisement audience
demographics, location, keyword, type, and/or bid) for presentation of the

12

Appeal 2017-010139
Application 11/803,779

advertisement at the one or more webpages. *Id.* at 4 (citing Patel, 5:60–64, 9:50–54, 10:4–11, 10:35–47); *see also* Scholl, 3:52–65 (describing the use of "stop words" to notify selected advertisers), 6:42–67 (creating a "stop list" based on search terms to preclude certain advertisers from an auction).

The Examiner also finds that Patel teaches or suggests generating first code for placement at a particular one of the one or more webpages in response to one or more options selected by a particular one of the one or more advertiser users (e.g., advertisers) in a user interface. The first code may be written to cause a billboard module (*see* Spec. ¶ 88) to be loaded. Final Act. 4; Ans. 9 (citing Patel, 13:49–67, 14:44–67). In particular, Patel uses HTML IFRAME tags and JavaScript to identify certain areas of the webpages to receive advertisements, and the Examiner finds HTML IFRAME tags to be a type of computer coding. Ans. 9. Because the tags are for certain areas of the webpages, the Examiner finds these tags teach generating a first code for advertisement placement. Final Act. 4 (citing Patel, 14:44–59, 21:1–6). Further, Patel teaches or suggests that when the particular webpage is loaded, the call to JavaScript is second code that is written to communicate over one or more computer networks with the one or more computing systems and to retrieve and display one or more advertisements on the particular webpage. *Id.* at 5 (citing Patel, 15:5–55).

The Examiner finds that Scholl teaches or suggests the system actions of selecting a subset of the plurality of records in response to a communication from the billboard module over the one or more computer networks. Final Act. 5–6 (citing Scholl, 6:1–21, 3:37–38, 3:52–65); Ans. 10–11. The plurality of records subset is selected based "at least in part on one or more keywords in the communication from the billboard module."

13

Appeal 2017-010139
Application 11/803,779

Final Act. 6–7 (emphasis omitted); *see* Patel, 12:52–62, 13:49–55. Further, Scholl teaches or suggests that, after selecting the plurality of records subset, the system conducts an auction to select a winning advertisement from the selected subset of records. Final Act. 6–7 (citing Scholl, 4:39–45, 6:42–67, 8:51–9:9); Ans. 10–11. As a result, the combination of Patel and Scholl teaches or suggests that, as a result of the auction, the winning advertisement may be retrieved and presented. Patel, 18:34–41 (describing real-time auctions), 35:23–55 (describing media exchange via auction); Scholl 6:27–41 (describing dynamic bidding in response to search request); *see* Final Act. 7; Ans. 10–11.

The Examiner also finds that Patel teaches or suggests "provid[ing] an interface for a webpage provider to contribute one or more advertising views/impressions . . . on one or more webpages of the webpage provider in barter exchange . . . for one or more advertising views/impressions . . . on one or more webpages of another webpage provider." Final Act. 7–8 (emphasis omitted); Ans. 11. In particular, the Examiner finds that Patel teaches or suggests that a pool or plurality of creatives may be used for a "banner barter service." Final Act. 8; Patel, 12:25–42. Moreover, the Examiner finds that the recited "barter exchange" "allows advertisers and publishers *an alternative method* for ad display an optimizing benefits for ad distribution" (Ans. 11 (citing Spec. ¶¶ 9, 13, 14)) and that the "interface" recited in this limitation is "not a new or additional interface" (*id.* (citing Patel, 12:22–42, 19:42–44)).

The Examiner finds that because Scholl teaches that the search engine sends the invitation to advertisers to participate in the dynamic bidding, a person of ordinary skill in the art would understand that an auction would be

14

Appeal 2017-010139
Application 11/803,779

conducted *after* the search engine receives the user's search query.  Final Act. 6–7; Ans. 10–11; *see* Scholl, 4:39–44, 8:51–9:9 (describing search query prompting dynamic bids).  The Examiner further finds that a person of ordinary skill in the art would have had reason to combine Scholl's teaching regarding the dynamic bidding motivations and techniques (Scholl, 3:52–65, 4:39–44, 6:27–67) with Patel's teachings regarding the use of embedded transparent pixels to communicate with the advertisement server (Patel 14:44–67), thus, giving a person of ordinary skill reason to program the transparent pixel with code language and to initiate an auction.  *See* Final Act. 6–7; Ans. 10–11.  "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007); *see* Patel, 2:31–58 (describing known problems with the exchange of advertising media and the placement of advertisements on a webpage); Scholl, 2:14–49 (describing known problems with search result advertising bidding).  Because Patel and Scholl are directed to advertising selection, the Examiner finds that a person of ordinary skill in the art would have had reason to combine their teachings to achieve the recited systems and methods.

### 1. Independent Claim 1

Appellants disagree for at least three reasons.  App. Br. 15–23; Reply Br. 5–11.  First, Appellants contend that Patel does not teach or suggest the system action of generating first code for placement at a webpage in response to one or more options selected by a user in a user interface.  App. Br. 16–17; Reply Br. 5–6.  In particular, Appellants contend that the portions

15

Appeal 2017-010139
Application 11/803,779

of Patel, upon which the Examiner relies, may teach the use of HTML IFRAME tags and JavaScript and activation of a throttling mechanism for banner serving, but do not teach or suggest generating the claimed "first code" in response to "one or more options selected by a particular one of the one or more advertiser users in a user interface," as recited in claim 1. App. Br. 17. We disagree.

The Examiner finds that Patel teaches the use of HTML IFRAME tags and JavaScript, which designates a section of the webpage at which information will be displayed. Ans. 9 (citing Patel, 14:44–67). In particular, Patel states that:

> if the consumer's browser supports the IFRAME tag, said tag is used. If said browser does not support IFRAME tags, but does support JavaScript, *JavaScript is used to insert the HTML into the web page at the desired location.* If said browser does not support JavaScript, *a default creative is selected for display.*

Patel, 14:45–51 (emphases added). Patel explains that these methods are used to achieve integration of the advertisement and the webpage. *Id.* at 14:21–33, 52–53. The Examiner finds that the identification of the first code is the HTML IFRAME tags and within that code is a call, i.e., *the second code*, to initiate JavaScript running in the designated area of the webpage to select the advertisement, which shows that a code is generated for advertisement placement on a webpage. Ans. 9.

Appellants contend that, although the Examiner finds that "[t]he advertiser [user] does have input or makes selections through the user interface to make several options such as the ad id, targeting criteria, banner, dimensions, etc. figs. 18-22 which gets matched to publisher" (*Id.*; *see* Patel, Fig. 21 ("Banner Management Page")), "the Examiner does not explain how

16

Appeal 2017-010139
Application 11/803,779

or cite to any location in *Patel* that discloses that *Patel's* 'HTML Iframe tags' (equated to the claimed 'first code' by the Examiner) is generated '***in response to one or more options selected by a particular one of the one or more advertiser users in***' any of the webpages of figures 18-22" (Reply Br. 6). Referring to Figures 21 and 22, however, Patel explains how an advertiser user's input may manage or edit banner size and shape, including designating alternative tags. Patel, 25:6–61 ("'Banner Name' and 'Alt. Tag' are editable'" and "Define an Alternate Tag"). Because the Specification does not define–or even use– the term "first code" apart from the claims, we interpret it broadly and are persuaded that the Examiner has shown that Patel teaches or suggests this limitation.

Second, with respect to claim 1, Appellants contend that Patel does not teach or suggest a database comprising "***one or more commands for assembling and presenting the one or more designated electronic content files as an advertisement at one or more of a plurality of webpages.***" App. Br. 17–18; Reply Br. 7–8. In particular, Appellants contend that (1) the Examiner erroneously maps "[t]he call to the JavaScript" to *both* the billboard module, i.e., the second code, (*see* Ans. 9) and to commands for assembling and presenting the advertisement content (*see id.* at 9–10) and (2) the "commands for assembling and presenting" are part of the plurality of records stored on the database, and the Examiner has not shown that Patel teaches or suggests that the call to JavaScript is stored in the plurality of records. Reply Br. 7–8. We agree.

With respect to Appellants' contention regarding the mapping of the call to the JavaScript to *both* the billboard module and to the commands for assembling and presenting, we agree that the Examiner's mapping is

17

Appeal 2017-010139
Application 11/803,779

inconsistent.  Initially, we note that claim 1 recites the billboard module and the commands for assembling and presenting as separate elements.  App. Br. 25 (Claims App'x (claim 1)); *see id.* at 30 (Claims App'x (claim 20 (reciting "commands" and dependent from claim 18))).  Further, the Specification explains that, once the auction has determined the winning advertisement, the advertisement is displayed within the designated billboard module according to the commands contained in the relational database file for the winning advertisement.  Spec. ¶¶ 72, 73.  The Examiner's mapping is inconsistent with this disclosure.

In addition, although the claims do not recite where the billboard module is stored, the Examiner does not find that Patel teaches or suggests that the call for the JavaScript is stored with the plurality of advertisement records.  Final Act. 4–5; Ans. 9–10.  Therefore, we agree with Appellants that Examiner fails to show that Patel's call for the JavaScript teaches or suggests the commands for assembling and presenting stored in the plurality of records.  Reply Br. 7–8.

Appellants contend, "[f]or at least these reasons, independent Claim 1 and its dependent claims are allowable.  For at least certain analogous reasons, independent Claim 18 and its dependent claims also are allowable.  Accordingly, Appellants respectfully request reconsideration and allowance of all pending claims."  *Id.* at 6.  Because each of independent claim 1 recites that commands for assembling and presenting are stored in the plurality of records within a database and a separate billboard module, i.e., second code, we do not sustain the Examiner's rejections of claim 1 and the claims that depend therefrom.

18

Appeal 2017-010139
Application 11/803,779

Further, claim 20, which depends from independent claim 18, recites "storing in the plurality of stored records one or more of: . . . one or more commands for retrieving, assembling, and presenting the one or more content files and customized text content as an advertisement." App. Br. 30 (Claims App'x (claim 20)). Because claim 18 recites a billboard module, i.e., second code, in substantially the same manner as claim 1 , we conclude that Appellants' contentions regarding the Examiner's mapping of the call for the JavaScript apply equally to dependent claim 20, but not to independent claim 18 or to the other claims dependent therefrom.

### 2. Independent Claim 18

Because the Examiner's findings and Appellants' contentions with respect to all of the rejections are based on the application of the combined teachings of Patel and Scholl to the recitations of claim 1, we now consider Appellants' remaining contentions in so far as they apply to independent claim 18 and dependent claims 21, 23, 24, and 33. Appellants' third contention is that the combination of Patel and Scholl does not teach or suggest "provid[ing] [one or more] instructions to the billboard module for the billboard module to retrieve the winning advertisement and present the winning advertisement in an area on the particular webpage designated by the billboard module," as recited in claim 18. *See* App. Br. 19 (quoting claim 1). In particular, although Appellants acknowledge that Patel teaches the HTML IFRAME tag and Scholl teaches a search engine system, Appellants contend that the portions of Patel and Scholl, relied upon by the Examiner and quoted in the Reply Brief, fail to show instructions provided to the billboard module to retrieve and present the winning advertisement.

19

Appeal 2017-010139
Application 11/803,779

App. Br. 19–21; Reply Br. 8–10.  In the quoted portion of Scholl, Scholl states that:

> *Based in part on the notification response*, the search engine computer system composes a search result web page 112– also called a "search response"–potentially including an advertising message specified by the bid in the notification response.  This search result is returned to the client computer system for display.  Table 4 below shows a sample search response.

Scholl, 5:22–29 (emphasis added); *see* App. Br. 20.  Further, in the quoted portion of Scholl, Scholl states that:

> After performing steps **303** and **304**, the [software] facility continues in step **305**.  In step **305**, the facility selects one or more advertising bids for inclusion with the search result.  The selected advertising bids may be among the bids *received in the responses to the notification*, cached bids from responses to earlier notifications, and/or earlier received prospective bids.  Bids may be selected in a variety of ways, such as by highest bid amount, highest expected value based upon bid amount and historical performance of advertising messages from each advertiser, etc.

Scholl, 6:43–51 (emphasis added); *see* App. Br. 20.  Referring to Scholl's Figure 3, step 306 provides that the facility "repl[ies] to search request with response containing search result and advertising messages of selected advertising bids."  Scholl, Fig. 3; *see id.* at 6:51–55.  Patel teaches that, upon receipt of notification, *the search engine* retrieves and presents the winning advertisement and Scholl teaches that, upon receipt of notification, *the software facility* retrieves and presents the winning advertisement.  However, as discussed above, the Examiner finds that Patel's call to the JavaScript teaches the recited billboard module.  Thus, neither Patel nor Scholl, alone or together, teaches or suggests that *the billboard module*, after

20

Appeal 2017-010139
Application 11/803,779

being provided instructions, retrieves and presents the winning advertisement, as recited in claim 18.

In the Answer, the Examiner does not show where either Patel or Scholl, alone or in combination, teaches or suggests this limitation. Ans. 10–11; *see* Reply Br. 9–10. Thus, we are persuaded that the Examiner erred in rejecting claim 18 and claims 21, 23, 24, and 33 that depend therefrom, and we do not sustain those rejections.

   3. *"barter exchange" limitation*

Each of independent claims 1 and 18 recites "provid[ing] an interface for a webpage provider to contribute one or more advertising views/impressions on one or more webpages of the webpage provider in barter exchange for one or more advertising views/impressions on one or more webpages of another webpage provider." *E.g.*, App. Br. 26 (Claims App'x (claim 1)). The Examiner finds that this is "an *alternative* method for ad display [and] optimizing benefits for ad distribution." Ans. 11 (emphasis added). However, the Examiner does not show where the claims recite or the Specification discloses that the barter exchange is an *alternative* method, instead of an *additional* method. *Id.* (citing Spec. ¶¶ 9, 13, 14); *see* Spec. ¶ 6 ("Additionally, advertisers and ad publishers would benefit greatly from having an ad space exchange system where publishers can make available their ad space/impression/view inventory in exchange not only for revenues from ad placements but alternately or also in exchange for ad space for their own ads placed at third party network locations, or other barterable commodities."). Because we reverse the rejections of the pending claims for other reasons, we do not address potential deficiencies in the Examiner's findings regarding this limitation of independent claims 1 and 18 further.

21

Appeal 2017-010139
Application 11/803,779

## V.    DECISION

For the above reasons, we reverse the Examiner's decision rejecting claims 1, 2, 4, 5, 7, 9–13, 15–18, 20, 21, 23–25, 31, 33, and 35–37.

<u>REVERSED</u>

22