UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| RICH MEDIA CLUB LLC,<br><br>   Plaintiff,<br>vs.<br>DMG MEDIA LIMITED,<br><br>   Defendant. | Case No. 2:23-cv-388-JRG<br><br><br><br>Jury Trial Demand |

**SECOND AMENDED COMPLAINT**

This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code, against Defendant DMG Media Limited ("DMG") that relates to three U.S. patents owned by Rich Media Club, LLC ("RMC"): 11,443,329; and 11,741,482 (collectively, the "Patents-in-Suit").

**The Parties**

1. Plaintiff Rich Media Club LLC ("RMC") is a company organized under the laws of the State of Florida with a principal place of business in Salt Lake City, Utah.

2. Defendant DMG Media Limited ("DMG") is a private limited company organized under the laws of the country of England with a principal place of business at Northcliffe House, 2 Derry Street, London, W8 5TT.

**Jurisdiction and Venue**

3. This is a civil action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1, et seq., and more particularly 35 U.S.C. § 271.

4. This Court has jurisdiction over the subject matter of the patent infringement action under 28 U.S.C. §§ 1331 and 1338(a).

5. DMG is subject to this Court's general personal jurisdiction pursuant to due process and/or the Texas Long Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.042, due at least to its substantial business conducted in this District, including: (i) having solicited business in the State of Texas, transacted business within the State of Texas and attempted to derive financial benefit from residents of the State of Texas in this District, including benefits directly related to the instant patent infringement causes of action set forth herein; (ii) having placed its products and services into the stream of commerce throughout the United States and having been actively engaged in transacting business in Texas and in this District, and (iii) having committed the complained of tortious acts in Texas and in this District. DMG, directly and/or through subsidiaries and agents (including distributors, retailers, and others), makes, imports, ships, distributes, offers for sale, sells, uses, and advertises (including offering products and services through its website, dailymail.co.uk (also known as MailOnline or dailymail.com) its products and/or services in the United States, the State of Texas, and the Eastern District of Texas. DMG, directly and/or through its subsidiaries and agents (including distributors, retailers, and others), has purposefully and voluntarily placed one or more of its infringing products and/or services, as described below, into the stream of commerce with the expectation that they will be used by consumers in the Eastern District of Texas. These infringing products and/or services have been and continue to be used by consumers in the Eastern District of Texas. DMG has committed acts of patent infringement within the State of Texas and, more particularly, within the Eastern District of Texas.

6. Venue is proper as to Defendant DMG, which is organized under the laws of England. 28 U.S.C. § 1391(c)(3) provides that "a defendant not resident in the United States may be sued in any judicial district."

**Additional Facts Relating to Jurisdiction**

7. DMG operates a newspaper/news site brand, the "Daily Mail," that is made available to anyone with a web browser, including users in the State of Texas and this District, through the website at the url: www.dailymail.co.uk (the URL www.dailymail.com redirects to the same .co.uk domain).

8. DMG's product – the website itself – is the product accused of infringement in this complaint.

9. According to one report, The Daily Mail website ranks eleventh among English-language news sites in the United States based on the number of monthly users (114.9 million in September 2023). Exhibit I. Statista Report. This is substantially higher than other well-known news sites with a national reach that includes the State of Texas and this District such as the Associated Press (apnews.com; 79.6 million visits), *Forbes* (forbes.com; 72.6 million users), and *The Wall Street Journal* (wsj.com; 65.1 million visits).

10. DMG's parent company, the DMG Trust ("DMGT"), reported in its 2023 annual report revenue "based on the geographic location of customers" in three geographic regions. For the fiscal year ended September 30, 2023, DMGT reported 160 million GPB in revenue from customers based in North America. For the fiscal year ended September 30, 2022, DMGT reported 209 million GPB in revenue from customers based in North America. Exhibit A, 2023 Annual Report, page 72.

11. On information and belief, and particularly because the website is written in English, a significant portion of the revenue reported as from "North America" was generated from users based in the United States, including revenue from users based in the State of Texas and in this District.

12. DMG solicits subscriptions to the digital version of its paper via at least the following website: https://www.mailsubscriptions.co.uk/. Such solicitations are directed to individuals throughout the United States, including people who reside in the State of Texas and this District.

13. DMG reports a growing subscriber base in the United States: "The financial performance of the Property Information business is expected to continue to be affected by UK property transaction volumes, notably in the residential market, as well as by subscription revenues in the US, where the revenue outlook for FY 2024 is more encouraging." Exhibit A, page 4.

14. DMG's specifically targets residents of the State of Texas at least because the website includes a webpage dedicated to news from Texas: https://www.dailymail.co.uk/news/texas/index.html, which includes "Trending Texas News."

15. DMG operates an on-line store that it makes available to anyone with a web browser through the website at https://shop.dailymail.co.uk/.

16. In 2014, the Guardian reported that "Almost 70% of [DMG's] monthly web traffic comes from outside the UK, with most of that from the potentially lucrative US market" and that DMG "paid potentially as much as £1m-plus in bid to boost international traffic, particularly in the US." DMG did this by purchasing the "dailymail.com" domain name, which had been owned by South Carolina-based Charleston Daily Mail. See https://www.theguardian.com/media/2014/jan/27/mail-online-com-domain-name.

## Background Facts

### Online Advertising and RMC's Technology

17. RMC solves technical issues with online advertising with innovative, patented technology. By understanding the relationship between the size of content and the size of ads placed alongside the content, RMC's technology can, among other things: (1) assist in loading ads just before a user is expected to scroll to the content; (2) confirm that an ad is actually placed with the content regardless of whether it becomes viewable (and for how long); (3) confirm that an ad actually became viewable (and for how long); and (4) allow for the "first print" of ads to be replaced with a "second print" different ad based on various criteria, such as how long the first print ad had been placed, was viewable, or both.

18. On May 17, 2023, RMC sent a notice of patent infringement letter to DMG regarding its infringement of U.S. Patent Nos. 11,443,329, and allowed U.S. Patent App. No. 17/961,952 (now issued U.S. Patent No. 11,741,482).[1]  The letter included detailed claim charts for each infringed claim, incorporated herein and attached as Exhibits B-D. RMC and DMG continued to communicate via email and by phone but failed to reach an agreement on licensing terms.

19. U.S. Patent No. 11,443,329 was duly issued to RMC on September 13, 2022. Patent No. 11,741,482 was duly issued to RMC on August 29, 2023.

20.  As explained in the attached opinion (Exhibit E), which is incorporated by reference, the patents are subject matter eligible. *See, e.g., Rich Media Club v. Duration Media*, opinion, Case No. 2:22-cv-02086 in the United States District Court of Arizona.

---

[1] Exhibit D is the claim chart provided to Defendant on May 17, 2023, before the issue date of the '482 Patent. Allowed claims 2, 4, 5, and 7 issued as identical claims 1, 3, 4, and 6.

21.     Electronic advertising that was never actually displayed or seen by consumers was an unresolved technical problem as of the time of the patented inventions.

22.     The asserted patents' claims address the problems with Internet advertising at the time that certain advertisements were never displayed on the screen to the consumer. The RMC claims disclose inventive solutions for this particular Internet-centric problem.

23.     The claims address these technical challenges. These challenges are particular to advertising on the internet and other electronic networks. The claims do not resolve these problems by reciting an abstract idea or through routine, well-understood, or conventional steps or components. At the time of the invention, the individual elements in the claim, and the claimed combination, were not well-understood, routine, or conventional activity.

24.     The claims do not recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks. Confirming that it is rooted in technology, and that it does not recite only conventional computer technology, the '329 patent specification discloses over ten pages of sample computer code, including at columns 24-35, 42-49, and 65-68.

25.     The claims do not broadly and generically claim "use of the Internet" to perform an abstract business practice (with insignificant added activity). The claims at issue here specify how interactions with the Internet are manipulated to yield a desired result—a result different from the conventional and a result that overrides the routine and conventional sequence of events ordinarily triggered. The invention stops the computer network from operating in its normal, expected manner by reciting an invention that is different from the routine or conventional use of the Internet.

26. The claims of the asserted patents do not claim any basic tool of scientific and technological work or hinder the use of any idea in all scientific fields.

27. Multiple patents related to the '329 and '482 patents have traversed rejections under § 101. For example, the PTAB reversed a rejection under § 101 of the '329 patent's grandparent Application No. 11/803,779, now U.S. Patent No. 10,380,602. That decision is Ex Parte Brad Krassner, dated December 18, 2018 and is attached hereto at Exhibit F. The PTAB found those claims, directed to presenting electronic advertisements on webpages, to be patentable.

28. In its decision, the PTAB relied on *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014):

> Accordingly, as in DDR Holdings, the claims recite "a solution to this network-centric challenge," e.g., the efficient, timely, and cost effective application of advertisements to webpages, for which there was no pre-computer or pre-Internet analog.

Exhibit F, at 12.

29. During prosecution of another patent related to the '329 and '482 patents, U.S. Application No. 11/643,245, now Patent No. 10,380,597, the examiner relied on this PTAB decision in the Notice of Allowance, explaining that "per the reasoning explained in the Patent Board Decision issued on December 18, 2018, the previous 101 rejection, 103 rejection, and examiner arguments have been withdrawn and the claims are allowable." Exhibit G, at p. 6.

**DMG's pre-suit knowledge of the patents, refusal to accept service, and motion to dismiss**

30. On May 17, 2023, RMC sent DMG a letter putting DMG on notice that it infringed each of the patents in suit.

31. The letter included the claim charts now attached as Exhibits B, C, and D to this First Amended Complaint.

7

32. DMG was in possession of the claim charts providing an element-by-element analysis of infringement over three months before this suit was filed.

33. On June 28, 2023, counsel for RMC spoke with a representative from DMG.

34. On August 25, 2023, after multiple unanswered follow-up emails to DMG, lawyers with the Fenwick firm indicated that they represented DMG in the matter.

35. On August 29, 2023 counsel for RMC sent counsel for DMG the same claim charts that had been sent to DMG directly on May 17, 2023 and filed the Complaint in this case.

36. Counsel for DMG declined to accept informal service of the complaint.

37. RMC served the complaint on DMG at its offices in London pursuant to the Hague Convention.

38. Despite having the complaint since August 30, 2023, and adding months of delay due to service through the Hague Convention, on December 5, 2023, counsel for DMG requested an additional 30-day extension to answer or otherwise plead, bringing the total time counsel for DMG had possession of both the original complaint and the claim charts to 97 days and making DMG's deadline to answer January 11, 2024.

39. Counsel for DMG first raised a concern about the complaint not including the claim charts on January 9, 2024, two days before DMG's responsive pleading was due, and demanding a response by noon the next day. Counsel for DMG had possession of both the original complaint and the claim charts for 132 days and DMG had been in possession of the claim charts for nearly eight months.

40. Adding the claim charts to the complaint provides no additional information to DMG or its counsel.

41. DMG's refusal to accept service, 30-day extension, and motion to dismiss were actions taken to delay the resolution of this matter.

### Count I: Infringement of U.S. Patent No. 11,443,329

42. RMC reasserts and realleges the previous paragraphs of this Complaint as though set forth fully here.

43. DMG directly infringes at least claims 1-3 and 5 of the '329 Patent by operating its website at dailymail.co.uk, as further detailed in Exhibit B (incorporated by reference). DMG performs each and every limitation of the claimed methods:

> 1. A method comprising:
>
> (a) determining whether a predefined area of an ad content display page that is used to display an advertisement is in view within a visible area of a browser window of a browser configured to be operated by a remote computing device, wherein the predefined area is a portion of the ad content display page, and wherein the ad content display page includes (i) the predefined area configured to display advertisement content, the predefined area being a portion of the ad content display page, and (ii) page content displayed in other portions of the ad content display page, the page content being separate from the advertisement content; and
>
> (b) in response to a determination that the predefined area that is used to display the advertisement has been in view within the visible area of the browser window for a predefined period of time, causing a communication to be sent to one or more dispatcher servers, wherein the one or more dispatcher servers are configured to:
>
>> (i) receive the communication;
>>
>> (ii) cause a replacement advertisement to be selected for display on the ad content display page; and
>>
>> (iii) cause the replacement advertisement to be served to the remote computing device;
>>
>> wherein the browser is further configured to render the replacement advertisement in the predefined area.
>
> 2. The method of claim 1 wherein the replacement advertisement is selected at least partially as a result of a replacement auction.
>
> 3. The method of claim 2 wherein the replacement auction is conducted in real time between the time the second communication is sent from the

> remote computing device and the time that the replacement advertisement is selected.
>
> 5. The method of claim 1 wherein the predefined area of the ad content display page currently displays an advertisement, and wherein the replacement advertisement replaces the currently displayed advertisement.

44.     DMG performs the method claimed in claim 1 via its website, dailymail.co.uk (also known as MailOnline and dailymail.com).

45.     DMG's website comprises ad content display pages that are used to display advertisements. DMG determines whether a predefined ad space of its website is in view within a visible area of a browser window. The predefined ad space is a portion of the website. The advertisement is in view on the webpage.

46.     DMG's website is viewable on browsers configured to be operated by remote computing devices (e.g., laptops, smartphones, and tablets).

47.     DMG's website includes the predefined ad space configured to display advertisement content and separate page content (e.g., news headlines and images) displayed in other portions of the website.

48.     DMG determines that the predefined ad space has been in view in the browser window for a predefined period of time (e.g., 15 seconds). In response to this determination, DMG causes a communication (e.g., an ad request) to be sent to one or more dispatcher servers. The dispatcher servers are configured to receive the communication, cause a replacement advertisement to be selected for display on the website, and cause the replacement advertisement to be served to the remote computing device. The browser is further configured to render the replacement advertisement in the predefined ad space.

49.     DMG selects the replacement ad at least partially as a result of a replacement auction.

50. DMG's replacement auction is conducted in real time between the time the second communication is sent from the remote computing device and the time that the replacement advertisement is selected.

51. The predefined ad spaces on DMG's website currently display an advertisement and the replacement advertisement (replaces the currently displayed advertisement).

52. RMC has suffered and is suffering damages as a result of DMG's infringement, which damages may include lost profits or a reasonable royalty in an amount to be determined at trial.

53. DMG has had knowledge of the '329 Patent and allegations of how the Accused website infringes claims of the '329 Patent since at least May 17, 2023, when DMG received a notice of patent infringement letter from RMC. DMG's infringement of the '329 Patent is therefore willful and deliberate, entitling RMC to increased damages under 35 U.S.C. § 284.

54. DMG's conduct is also exceptional, entitling RMC to recover its attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

### Count II: Infringement of U.S. Patent No. 11,741,482

55. RMC reasserts and realleges the previous paragraphs of this Complaint as though set forth fully here.

56. DMG directly infringes at least claims 1, 3, 4, and 6 of the '482 Patent by operating its website at dailymail.co.uk, as further detailed in Exhibit D (incorporated by reference).[2] DMG performs each and every limitation of the claimed method:

> 1. A method for rendering advertisement content in an ad content display page, wherein the ad content display page includes (i) a predefined area configured to display advertisement content, the predefined area being a

---

[2] Exhibit D is the claim chart provided to Defendant on May 17, 2023, before the issue date of the '482 Patent. Allowed claims 2, 4, 5, and 7 issued as identical claims 1, 3, 4, and 6.

portion of the ad content display page, and (ii) page content displayed in other portions of the ad content display page, the page content being separate from the advertisement content, the ad content display page being scrollable to allow a portion of the ad content display page to appear in a visible area of a browser window of a browser that is configured to be operated by a remote computing device, the method comprising:

(a) determining whether a predefined portion of the predefined area of the ad content display page is in the visible area of the browser window; and

(b) in response to a determination that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window, causing a communication to be sent from the remote computing device to one or more dispatcher servers, wherein the one or more dispatcher servers are configured to:

    (i) receive the communication, and

    (ii) cause advertisement content to be served to the remote computing device, wherein the browser is configured to render the advertisement content in the predefined area of the ad content display page, and

wherein the advertisement content first appears in the predefined area of the ad content display page only after the one or more dispatcher servers serve the advertisement content to the remote computing device and the browser renders the advertisement content in the predefined area of the ad content display page.

3. The method of claim 2 wherein the advertisement content is selected at least partially as a result of an auction.

4. The method of claim 3 wherein the auction is conducted in real time between the time the communication is sent from the remote computing device and the time that the advertisement content is selected.

6. The method of claim 1 further comprising:

(c) maintaining the same advertisement content that was previously rendered in the predefined area for at least a predefined period of time during the time period that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window.

57. DMG performs the following claimed method for rendering advertisement content in an ad content display page via its website, dailymail.co.uk (also known as MailOnline and dailymail.com).

12

58. DMG's website comprises ad content display pages. DMG's website includes a predefined ad space and separate page content (e.g., news headlines and images) displayed in other portions of the website. DMG's website is scrollable to allow a portion of it to appear in a visible area of a browser window.

59. DMG's website is viewable on browsers configured to be operated by remote computing devices (e.g., laptops, smartphones, and tablets).

60. DMG determines whether a predefined portion (e.g., at least 50%) of the predefined ad space is visible. In response to this determination, DMG causes a communication (e.g., an ad request) to be sent from the remote computing device to one or more dispatcher servers.

61. The dispatcher servers are configured to receive the ad request and cause advertisement content to be served to the remote computing device. The browser is configured to render the advertisement content in the predefined ad space. The advertisement content first appears in the predefined ad space only after the dispatcher servers serve the advertisement content to the remote computing device and the browser renders the advertisement content in the predefined ad space of the website.

62. DMG selects advertisements at least partially as a result of an auction.

63. DMG's auction is conducted in real time between the time the communication is sent from the remote computing device and the time that the advertisement content is selected.

64. DMG maintains the same advertisement content in the predefined ad space for at least a predefined period of time (e.g., 20 seconds) during the time period that the predefined portion (e.g., at least 50%) of the ad space is in the visible area of the browser window.

65. RMC has suffered and is suffering damages as a result of DMG's infringement, which damages may include lost profits or a reasonable royalty in an amount to be determined at trial.

66. DMG has had knowledge of the '482 Patent and allegations of how the Accused website infringes claims of the '482 Patent since at least May 17, 2023. DMG's infringement of the '482 Patent is therefore willful and deliberate, entitling RMC to increased damages under 35 U.S.C. § 284.

67. DMG's conduct is also exceptional, entitling RMC to recover its attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## Jury Demand

RMC demands a trial by jury on all issues that may be so tried.

## Request For Relief

WHEREFORE, Plaintiff RMC requests that this Court enter judgment in its favor and against Defendant DMG as follows:

A. Adjudging, finding, and declaring that DMG has infringed the '329 Patent, and the '482 Patent under 35 U.S.C. § 271;

B. Awarding the past damages arising out of DMG's infringement of the '329 Patent, and the '482 Patent to RMC either in RMC's lost profits or in an amount no less than a reasonable royalty, together with prejudgment and post-judgment interest, in an amount according to proof;

C. Adjudging, finding, and declaring that DMG's infringement is willful and awarding enhanced damages and fees as a result of that willfulness under 35 U.S.C. § 284;

D. Awarding attorneys' fees, costs, or other damages pursuant to 35 U.S.C. §§ 284 or 285 or as otherwise permitted by law;

  E. Entering an injunction preventing DMG from continuing to infringe the '329 Patent, and the '482 Patent;

  J. Granting RMC such other further relief as is just and proper, or as the Court deems appropriate.

DATED: April 30, 2024

            Respectfully submitted,

            <u>/s/ Alison A. Richards</u>
            Alison Aubry Richards
            IL Bar # 6285669 (*also admitted in ED Texas*)
            arichards@giplg.com
            Global IP Law Group, LLC
            55 West Monroe Street, Suite 3400
            Chicago, IL 60603
            Telephone: (312) 241-1500

            *Attorney for Plaintiff Rich Media Club, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a). Therefore, this document was served on all counsel who are deemed to have consented to electronic service on April 30, 2024. Local Rule CV-5(a)(3)(A).

/s/ Alison Richards
Alison Aubry Richards